Mr. O'Toole. Yes, good morning your honors. John O'Toole representing the plaintiff Terry Smith. May it please the court. Stokey Muzik. Stokey Muzik. These are lines quoted by who continues to get beat and continues to get back up. That your honors is Terry Smith. We are here on appeal from the grant to summary judgment on two counts. One on retaliation, the other count having hostile work environment. In order to prove retaliation, the plaintiff was required to prove that he was engaged in a between the two. Counsel, on hostile work environment, is using the n-word by itself sufficient? Is it severe enough that a single use of the word constitute a hostile work environment? It depends on the circumstances your honor. In Terry Smith's case, he was directed to his face the n-word and it was done by a supervisor. It wasn't done by a co-employee or co-employer. It was done by a supervisor. In the case of Gates, the court found that when you have a situation where an employee is directly confronted with the n-word and it's done by a supervisor, that's on the more severe end of the spectrum of hostile work environment. And it was accompanied by this threat about losing your house? That's correct your honor. And other threats as well. And there was another supervisor by the name of Roman McGee said he was going to kick his butt and he called him. But I'm just focused right now on the n-word. Yes, that's correct your honor. And the n-word. In that interaction about the n-word, the relevant fact really was that he used the n-word and he threatened him with the loss of his house and he'd been coming back from a situation in which he was involved in some sort of disciplinary hearing because of the way that he had treated your client. That's correct your honor. Is there anything else you want us to focus on with respect to that interchange? On the hostile work environment? With respect to that n-word exchange. No, except that there was another case, a dandy case, that also supports the notion that when a client comes from a supervisor, it's again on a more severe end of the hostile work environment. There's two cases on point. Returning back to the retaliation case, the district court found in favor of the adverse work environment, excuse me, adverse employment action and found in favor of the plaintiff as far as the protected activity. The sole issue was the bust or other causal connection. District court found fault with what they said were not sufficient facts. This is to support the expert report by Maria Veronica, specifically focusing on the lack of sworn testimony that she did not consider. If I could call the court's attention to exactly what Maria Veronica focused on, and I think it's overwhelming evidence, and I'd also like to point out that it's evidence that comes from the defendant as well as the plaintiff. She came into this with an unbiased viewpoint. She looked at both sides, and she looked at reports that were current at the time. She specifically looked at 33 attachments. She looked at daily training evaluation sheets. She looked at memos. She looked at emails, performance evaluations, progress reports, personnel policies, emergency traffic patrol training manuals. The question is, how much is enough? She's an expert. There was no question as to her qualifications. In fact, there is no question at the district court level or by the appellee as to her methodology, which is really the focus of Daubert and other court cases as to the admission of expert testimony. So the court again looked at the report by Maria Veronica and said there wasn't sufficient data. And I could find no case that exactly illuminates how much is enough. For instance, let's say you have an expert testifying as to a jack, whether the jack was manufactured correctly. Let's say there's 40 reports that talks about this jack. Does the expert have to consider all 40 reports? Can he look at the reports from what he considers more reliable sources and exclude, say, 10 of them, just focus on 30? I think the district court intruded into the province of the expert by indicating indirectly exactly what reports she has to examine. I think that should be left in the province of the expert. The gatekeeping function that the court has has a focus on the methodology. And again, there was no dispute as to the methodology Maria Veronica applied. The connection between the adverse employment action and a protected activity is not just from the expert report Maria Veronica. It's also from the affidavit of Marvin Harrison. The court found fault with the affidavit of Marvin Harrison for lack of what they said was foundational information. However, in point of fact, there is sufficient foundational information. Marvin Harrison states in his affidavit that it's based on his personal knowledge and belief. He states a specific time frame involved, two months. He identifies the individual who made discriminatory comments, that being Lloyd Colbert. Lloyd Colbert, incidentally, is the same person that called Terry Smith the N-word. He describes an email he sent out specifically on October of 2013. So we have a very specific month when he sent it out. Refused to sign off on an evaluation. Counsel, let me direct your attention to page two of the affidavit. When he says he referred to Lloyd Colbert, he says he was mistreated by Lloyd Colbert, who called him the N-word frequently. But the district court said, well, that could have been hearsay. You know, he didn't say how he knew that he didn't say if he heard it himself. You know, the problem of the foundation not being laid. Do you want to address that? Because, you know, I think that would have been good evidence for you. That's true, Your Honor. And as far as we know, Mr. Smith did not hear that directly from Marvin Harrison. But I believe that's non-hearsay, Your Honor. Mr. Marvin Harrison is employee of the defendant. It's not an exception to hearsay. I think it's just non-hearsay. I think it would be admissible. Mr. O'Toole, you certified under Circa Rule 30 that you would attach the opinion of the district court. Did you attach the opinion of the district court in your appendix? I believe I did, Your Honor. I don't know standing before you, but I believe I did. If not, I believe the opposing counsel did. I don't recall. I had to pull it from the record. Pardon? I didn't see it. I didn't get it from the record. Yeah, I didn't either. I mean, that's a baseline requirement that we have provided, the opinion of the court below. And I think you certified that you did. I thought it was part of the docket, Your Honor, the opinion that's included in there. I think we had to get it from somewhere else. I don't remember where. Do you want to reserve some time for rebuttal? Yes, Your Honor. Ms. Schoenhardt. Good morning, and may it please the court. This court should affirm the district court's grant of summary judgment to the department. Mr. Smith began receiving unsatisfactory performance evaluations from nearly the beginning of his tenure with the department as a probationary ETP. And those unsatisfactory reports continued throughout his term with the department. As a result, no reasonable jury could conclude that Smith was terminated for any protected activity rather than for his overwhelmingly poor work performance. What about the hostile work environment claim and the severity of the use of the N-word? Because one is never enough? It's not that one is never enough. Certainly there may be a case where one could be enough. But in this case specifically, it's important to consider that before this single instance of a racial slur was used, Smith very well may have been working in a tense or a high-pressure work environment. But the undisputed evidence shows that that work environment was because of Smith's own actions and his own behavior during his time as a probationary ETP. There's multiple instances in the record where his supervisors reported that he was repeatedly debating instructions with his superiors, telling them that they did not know what they were talking about, that he didn't have to listen to them anymore. So is what you're saying that regardless of whether it might be severe in another case, its use in this case was not what altered the terms and conditions of employment? That is correct. And also considering that at the time that this incident occurred, the department had already taken the steps to initiate termination proceedings of Mr. Smith. The department had already charged him with failing to complete the probationary period satisfactorily and to initiate termination charges against him at that point. So this one single instance of a racial slur cannot be used to retroactively impute racial animus to any of the other disagreements that Mr. Smith may have had with any of his supervisors that may have caused a tense or high-pressure work environment for him. How much time was there between the use of the N-word and when he was actually let go? I believe the charges were filed against him at the beginning of January. I believe it was January 3rd. The hearing on those charges took place on January 8th or 9th. This incident occurred, I believe, on January 14th. And then the recommendation that he be discharged was formally approved on January 30th. So it was in a month time frame. His file, I'd call it any way you want to describe it, file or whatever. But it seemed to me it was a confrontational thing where this, which his name had continued to screw up, Smith, and continued to do things wrong. And so he yells at him a nasty thing. Yes, that's correct. But it was under a circumstance, I think, where he was way out of line for what he said, but not for why he said it, I guess. That is correct. At this time leading up to this instance, particularly in December, there had been several instances where Mr. Smith had engaged in unsafe behavior and had also, again, had repeated run-ins with his supervisors when they would try to correct him on unsafe behavior, explain to him what he needed to do to try to change his behavior, what he shouldn't be doing. Smith became very confrontational. One of his supervisors describes Smith as becoming very unstable during these confrontations. And so that was sort of the work environment leading up to this interaction. Well, I want to be clear also what this job is. I'm from South Bend. We don't have the interstate and everything else in the middle of the night where somebody goes off the road and needs help. What is this, what is the duty, what is one expected to do in this job? Yes, so ETPs, they patrol the highways. They assist motorists, stranded motorists or motorists with broken down vehicles. They assist with removing any kind of trash or rubble on the road and assist with moving broken down vehicles. They also have two radios in their trucks. One is for the department's radio and the other is for Illinois State Police. They need to be able to reach out to State Police to call them if there are accidents to report what assistance is needed and the locations and those sorts of things. So there was a lot of testimony during discovery in this case explaining that this is a very dangerous job, that the ETPs need to be able to trust each other and to do their job safely in order to make sure that they go home each night but also that members of the public are safe on the highways. So it's somebody actually looking for trouble and then having to deal with it in whatever way they encounter it. Right, yes, exactly. So these ETPs are, again, patrolling the highways seeking out to assist any motorists who may be stranded or need help or need assistance calling for other backup from State Police or medical assistance. So again, I would just like, going back very quickly to the hostile work environment claim to point out that the other two instances that Mr. Smith points to where he had interactions with supervisors, in neither of those instances did either of the supervisors say anything to him about his race or use any kind of racial slur or term. Were those the situations in which they used profanity but were equal opportunity profanity users? Yes, that's correct. Smith himself testified that his supervisor, Mr. Vail, was an equal opportunity cursor and then his supervisor, McGee, who tried to confront him the day after an incident in which he wanted to correct some behavior of Mr. Smith's on the highway. McGee admitted there was a heated exchange between the two. Again, they were arguing with each other over whether or not Smith had or had not done something, but McGee did not say anything regarding Smith's race nor did Smith testify that McGee said anything about his race. So again, it's just this single instance that occurred after this buildup of tension and high pressure. And he sought the medical, didn't he take a leave of absence to seek medical treatment because he was becoming so angry and having homicidal thoughts about people at work? I believe the record shows that he, shortly after this incident with Colbert, I believe it was within the next week or so, he did start to take leave time. After the N-word incident? After the N-word incident, he did start to take leave time. And I believe there was evidence in the record in response to interrogatories where Smith stated that he had sought treatment for depression. I don't know that there was any evidence in the record, though, specifically connecting any treatment for depression to that specific incident involving the racial slur and whether or not that had been from any other incident involved during his six-month probationary period. I don't believe that that was in the record, connecting those two incidents to his seeking treatment for anything. And so, again, just based on this single instance, in this case, in this context, it could not create a hostile work environment. Just returning briefly to the retaliation claim, the district court explained in its opinion below, basically from nearly the very beginning of Mr. Smith's time as a probationary ETP, his supervisors were reporting that he was having problems taking instructions, that he was consistently debating instructions with his supervisors. Several of his supervisors, in fact, said they would no longer be willing to train him because of their serious concerns with his ability to do the job safely. And that pattern of behavior continued throughout his time, his six-month period as an ETP probationary person, ultimately culminating in his last report where he received five unsatisfactory remarks and two minimally satisfactory remarks in two categories. And so, based on that overwhelming evidence of his consistent poor work performance, the district court correctly determined that there could be no causation as to Mr. Smith's retaliation claim. If the court has no further questions, we'd ask that this court affirm the district court's grant of summary judgment. Thank you. Thank you. Mr. Ochoa. Thank you, Your Honor. I would just like to pick up on a couple points. The retaliation claim was based on activities by Mr. Smith and the activities, of course, by the employer. The employer is coming at this that Mr. Smith was a horrible employee. He wasn't fit to do the job as a middleman. If Your Honor has heard the testimony from counsel as to just what a middleman does. Interesting, in the reports themselves, Mr. Smith obtained the highest ratings for safety and compliance with work policies. If he was such a horrible employee, if nobody wanted to go out on the road with him, why were they both checked and each instance satisfactory? Counsel, can you address the timing question that I was just talking about with your opposing counsel? The timing question of the use of the N-word, and then when he was let go, the timing of the use of the N-word, and his seeking medical treatment, and whether there was any evidence in the record that the two were linked? There's not any specific information, Your Honor, but there is information that Mr. Smith started, went to the Jesse Wake facility for depression shortly after hearing the N-word. I don't know the specific time. And when is it your view that the terms and conditions of employment were altered for your client? They were altered when he started being called the N-word. At the very end, when he had two weeks left before he was let go? Well, they were being altered, yes, towards the end, because the terms and conditions started to change after he heard the N-word. He had to go to the hospital. He was seeking treatment at the time. But you just said there was no evidence linking those events. I'm sorry, Your Honor. But you just said there was no evidence in the record linking his seeking depression and his hearing of the N-word. That's correct, Your Honor, but there is information that he started going to the Jesse White Center after hearing the N-word. You just don't know exactly what time. And after knowing that he was about to be terminated because there had already been a hearing. I don't think he was aware that he was for sure going to be terminated, Your Honor. But he knew that was in play. He knew that was in play. That's correct, Your Honor. Well, he was getting a lot of criticism along the way. He has been. That's correct, Your Honor. But he had received laudatory comments from Jorge Pineda, who was supervisor, who said some nice things about Mr. Smith, specifically a comment on his professional skills. Marvin Harrison, the supervisor from the B-shift, also talked about Mr. Smith, and specifically, if I could turn the Court's attention to the reply brief, where he says how they used heavy wreckers, they rolled over a tractor, and it was from his observations that all trainees had a basic understanding as well as basic concept of the jobs description of what it means to work as an ATP person. So I submit to Your Honor that there is a dispute of material fact into how some people viewed Mr. Smith's performance and how some people did not view his performance. And so I think that should be left to a jury to decide. Thank you, Mr. O'Connor. Thank you, Your Honor. Thank you, Mr. Chamberlain.